## FORBES *vs.* SCANNELL.

*Fourth Judicial District Court, July,* 1857.

COMMON LAW IN CHINA—COPARTNERSHIP—ASSIGNMENT.

This State, in point of sovereignty and jurisdiction, has the same dominion over personal that it has over real property actually situated within its territory; it may by law regulate its transfer, subject it to process and execution, and control its disposition to the same extent it may exert in its authority over real estate; but this should not be done in violation of the rules of law as fixed by comity.

In the absence of all proof that an assignment was made by compulsion of law, or under bankrupt or insolvent laws, it must be regarded as a voluntary assignment.

Where, under an assignment in a foreign country, property passes to the possession of the assignees, though the assignment is not recognized by the California law, yet it is sufficient to pass the property, and the assignees are entitled to be protected in their possession.

The Common Law is the particular law applicable by treaty to Americans residing in China, and not the general law prevailing in the Chinese Empire for the government of an unenlightened people.

In copartnership each partner ordinarily, in the absence of fraud on the part of the purchaser, has the *jus disponendi* of the whole partnership property.

Where a partner is absent, so that he cannot be consulted, an assignment by a copartner, of the partnership property, in trust for creditors, without preferences, if made in good faith, for sufficient cause, and for the benefit of the firm, is valid and should be sustained.

In an assignment it is sufficient if the debtor unconditionally and unreservedly transfers the whole of his property to assignees for the benefit of all his creditors.

The omission to annex the usual schedule is not sufficient to avoid an assignment.

Forbes *vs.* Scannell.

It is settled in the United States that assignments directly to creditors are not valid without their assent; but if made to trustees for their benefit it does not require their assent.

In determining the validity of an assignment the question is, not whether fraud may be committed by the parties to it, but whether the instrument is fraudulent in its operation.

The following are the facts of the case as agreed upon by stipulation, the other facts referred to in the opinion arose from depositions taken, or other evidence.

1. That the plaintiffs in this action compose the firm of Russell & Co., and James Purdon & Co., of Canton, named in the assignment of Nye Brothers & Co., hereinafter referred to.

2. That the firm of Nye Brothers & Co., referred to in the assignment, was composed of Gideon Nye, Junior, and two or more other persons.

3. That Messrs. Nye Brothers & Co., a mercantile firm composed of citizens of the United States, residents of and doing business in Canton, in China, shortly before the eleventh day of March, 1856, failed and became and on that day were insolvent. That on the said eleventh day of March, Gideon Nye, Junior, one of the said firm of Nye Brothers & Co., the only resident partner, and managing the affairs of the house at Canton, appeared before Oliver H. Perry, United States Consul at Canton, and signed and acknowledged before the said Consul an instrument in writing, which, with the acknowledgment thereof, is in the words following:

" Be it known that on the eleventh day of March, A. D. eighteen hundred and fifty-six, before me, Oliver H. Perry, Consul of the United States of America, at Canton, China, personally came and appeared Gideon Nye, Jr., a citizen of the United States of America, and at present a resident of the city of Canton, China, and a partner in the commercial house of Messrs. Nye Brothers & Company, residing, transacting, and doing business in the city of Canton, China, he being the only partner in the said commercial house of Nye Brothers & Company here present, and requested me to note that he desires to assign and hereby does assign, all and singular his real and personal property, as well as all and singular the real and personal property belonging and appertaining unto the said commercial house of Nye Brothers & Co.,

whether situate in China or elsewhere, jointly unto Messrs. Russell & Company, a commercial house residing and doing business in Canton, China, and unto James Purdon & Company, also a commercial house residing and doing business in the said City of Canton, China, in trust and for the benefit of each and all the creditors of the said Gideon Nye, Jr., and the said commercial house of Nye Brothers & Company, and the said appearer declared that he reserves to himself sufficient time to record in this Consulate a full and complete schedule of all the assets and liabilities, whether appertaining and belonging to him personally, or appertaining and belonging to the said commercial house of Nye Brothers & Company, of which he is a partner as aforesaid.

GIDEON NYE, Jr.,

For self and for

NYE BROTHERS & CO.

Noted before me on the eleventh day of March, A. D. eighteen hundred and fifty-six, at the hour of two P. M., this day ; in faith whereof I hereunto sign my name, and affix my seal of office.

OLIVER H. PERRY,

*U. S. Consul.*

{ L. S. }

That at the time of executing said instrument the said firm of Nye Brothers & Company was largely indebted to citizens and residents of China, and to citizens and residents of the United States, and to citizens and residents of Great Britain, and also to citizens of Great Britain and the United States residing at Canton.

4. That the merchandise in controversy was shipped by Nye Brothers & Co., from Canton, to Morgan, Hathaway & Co., at San Francisco, in the ship called the "Barreda Brothers," before their failure, in March, 1855, and that the "Barreda Brothers" returned to Canton, after the failure, from stress of weather, when the plaintiffs took actual possession of the goods, as assignees, under the before recited assignment of Nye Brothers & Co., and shipped them directly to Morgan, Hathaway & Co., for sale, with instructions to account to them, as such assignees, for the proceeds ; and that the seizure of the goods was made while in the possession of Morgan, Hathaway & Co., under the consignment of the assignees.

Forbes *vs.* Scannell.

5. That after the execution of the said assignment, a controversy arose between one A. B., a citizen of the United States residing at Canton, and the before mentioned Russell & Co. and James Purdon & Co., assignees as before mentioned, which became and was pending before the said Oliver H. Perry, United States Consul at Canton, and in which was involved the question, whether or not the said assignment was good and valid; and in said proceeding the said Oliver H. Perry rendered a decision in the words following:

" After a true and careful consideration of the case, the Court decides, that the assignment made by Gideon Nye, Jr., on the 11th of March last, of all and singular his real and personal property, as well as all and singular the real and personal property belonging and appertaining unto the commercial house of Nye Brothers & Co., unto Messrs. Russell & Co. and James Purdon & Co., in trust for the benefit of each and all the creditors of the said Gideon Nye, Jr.; and the said commercial house of Nye Brothers & Co. has received the assent and adoption of his, the said Gideon Nye, Jr.'s, copartners; and that an assignment made after insolvency, which divides the assets with perfect equality among all the creditors, is considered by the Court, under its equity jurisdiction, as a valid trust, and will be sustained.

" It is, therefore, decreed that all proceedings in this case be stayed without day.

" The costs in this case to be paid, one-half by the plaintiff and one-half by the intervenors."

OLIVER H. PERRY,<br>
<em>U. S. Consul.</em>

L. A. HITCHCOCK,
O. E. ROBERTS.

6. That the assignees have, by general and special circulars, notified the creditors and others dealing with the house of Nye Brothers & Co., of the state of the assets and liabilities; and that their business as assignees in the execution of their trust, is still unsettled.

7. That the the defendant, as Sheriff of San Francisco county, seized the goods in controversy, by a valid execution issued upon a valid judgment in favor of F. Huth & Co. vs. Nye Brothers & Co., and that said defendant knew at the time of such seizure that said

goods were claimed by the plaintiffs, as assignees of the defendants in the execution.

8. That the value of the said goods is fifty thousand dollars.

*Halleck, Peachy & Billings*, and *G. Yale*, for plaintiff.

*Julius K. Rose* and *W. Duer & D. Lake*, for defendant.

HAGER, J.—The parties, by stipulation in writing, have agreed upon and admitted the principal facts, and I shall therefore not refer to them except so far as it may be necessary to explain my conclusion upon some of the points raised upon the argument.

Upon the 11th day of March, 1855, the mercantile house of Nye Brothers & Co., doing business at Canton, China, became insolvent, and Gideon Nye, Jr., the only member of the firm then in Canton, for himself and his firm, before the U. S. Consul at that place, made and executed a written assignment of his personal, and also the partnership property, to the plaintiffs, residents of the same place, "in trust and for the benefit of all the creditors of said Gideon Nye, Jr., and the said commercial house of Nye Brothers & Co."

The assignees accepted the trust, entered upon the duties of their office, and with the acquiescence and co-operation of the creditors residing in China, took the possession and control of the insolvents property, and proceeded to convert it into money.

This action is brought by plaintiffs, as assignees, against the defendant, Sheriff of this County, to recover the value (admitted to be $50,000) of a quantity of teas belonging to the insolvent's estate, shipped and consigned by plaintiffs to a mercantile house in San Francisco, for sale, and there seized by defendant under an execution issued upon a judgment for $200,000, obtained by Frederick Huth & Co., of London, Great Britain, before the arrival of the goods in this State.

The principal question to be determined is whether the assignment made at Canton, by the one partner, Gideon Nye, Jr., is valid and binding upon the firm of Nye Brothers & Co., and sufficient to vest the property in question in the assignees, as against the judgment creditors named, and prevent its being seized by them upon execution.

In considering the question it is necessary in the first place to deter-

mine the law that is applicable to and should govern in testing the validity of the assignment, and of the rights of property.

1. It was urged upon the argument that the property being now within the territory of this State, the validity of plaintiffs' title, and the assignment, must be tested by the *lex fori.*

For many purposes personal property is deemed to have no *situs* except that of the domicil of the owner, yet this being but a legal fiction it yields whenever it is necessary, for the purposes of justice, that the actual *situs* should be inquired into. At the time of the assignment the property belonged to Nye Brothers & Co., and was then upon the high seas; owing to stress of weather the ship put back to Canton, where the property was taken possession of by plaintiffs, under the assignment, and by them forwarded to this port.

This State, in point of sovereignty and jurisdiction, has the same dominion over personal that it has over real property actually situated within its territory; it may by law regulate its transfer, subject it to process and execution, and control its disposition to the same extent it may exert in its authority over real estate; but this should not be done in violation of the rules of law as fixed by comity.

According to the authorities in the United States there is a recognized distinction between assignments *in invitum*, or under the bankrupt laws, and voluntary assignments made by the owner of property while residing in a foreign country; in the one case the transfer is by the operation of the law of the foreign country, in the other it is by the act of the party. In the absence of all proof that this assignment was made by compulsion of law, or under bankrupt or insolvent laws, it must be regarded as a *voluntary assignment.* Such assignment, if made according to the law of the domicil, will generally pass personal property, whatever may be its locality, abroad as well as at home. Story C. L., §410–411.

Now in this State, by our insolvent laws, as construed by the Supreme Court, all voluntary assignments by insolvent debtors for the benefit of creditors, are declared void. If, therefore, at the time of the assignment, this State had been the *situs* of the property, or if there had been no delivery in China to the assignees, and the property had arrived here as the property of the insolvents, the *lex loci rei sitæ* would have prevailed over the law of the domicil, and the questions

involved herein would have been determined by the laws of this State. But the assignment, and the delivery of the property under it, having been made and completed in China, and our statute law having no extra-territorial force, the assignees, if the assignment is in other respects valid and sufficient to pass the property, became *lege loci* the legal owners, and entitled to be protected in their possession of the property. United States *vs.* U. S. Bank, 8 Rob. (La.) R., 262.

2. At the time of the failure and assignment Gideon Nye, Jr., resided, and the place of business of their house was at the " *Factories,*" as it is called—an inclosed place, isolated and consisting of a few acres —outside of the walls of Canton, where the foreigners had their habitations, and were only permitted to reside and do business at that port. By the treaty of July 3d, 1844 (see treaty, U. S. Statutes at Large, 592) between the United States and China, five ports, of which Kwang Chow (Canton) is one, were opened to American commerce, and our government is authorized to appoint Consuls, and our citizens are permitted to reside there.

This treaty also provides for the examination and decision of controversies between citizens of the United States and subjects of China. Also that all questions with regard to rights of property or person, between citizens of the United States, shall be subject to the jurisdiction and regulated by the authorities of the government of the United States. And that controversies between the citizens of the United States, and the subject of any other government, shall be regulated by the United States and those governments, without any interference on the part of China.

By the Act of Congress of August 11th, 1846, (9 Stat. at Large, 276,) the Commissioner and Consuls of the United States, appointed to reside in China, are vested with judicial authority in civil and criminal cases ; the laws of the United States are extended over citizens of the United States in China, and where they are deficient the *common law* is extended in like manner ; and where they are both deficient the Commissioner shall, by decrees and regulations, which shall have the force and effect of law, supply such defects and deficiencies.

By the testimony it seems neither Europeans nor Americans resort to the Chinese Courts for the adjudication of questions involving rights of property, or for any other purpose, but each in such cases apply for relief, and transact legal business before their respective consuls.

What the prevailing Chinese law is does not appear, nor do I think it material, for if the provisions of the treaty are observed the laws of that country cannot prevail, and their tribunals. even if competent, have not the power to give relief when a controversy occurs between citizens of the United States and the subjects of any other government, although there may be no regulations by treaty on the subject between the respective governments.

The members of the firm of Nye Brothers & Co. and the plaintiffs are American citizens, and as such, under the treaty, and the subsequent legislation of Congress, are entitled to the protection of that system of jurisprudence known in this country and England as the *common law*. This same law prevails here and is the rule of decision in this State.

According to the principles of the common law the effect and validity of the instrument of assignment must be tested by the *lex loci* of the assignment; that is, the particular law applicable to Americans residing in China, and not the general law prevailing in the Chinese Empire for the government of an unenlightened people, unused to the customs and civilization of Christian nations. Even if we should hold that the general Chinese law must control, in the absence of all proof of what it is, by the law of this State the common law would be regarded as the *lex loci* of the assignment.

Adopting the principles of the common law for our guide, I will proceed to notice and consider some of the objections made against the validity and form of the assignment.

I. *One member of a partnership firm cannot alone make a valid assignment of the whole partnership effects for the benefit of creditors.*

In the absence of bankrupt laws prohibiting it, debtors have an absolute legal right, in good faith, to make a general assignment of their property in trust for the benefit of their creditors ; this power rests, as an incident to the right of property itself, on the same foundation with that to acquire and enjoy..

In cases of copartnership, each partner being the authorised agent of the firm, in ordinary cases, and in the absence of fraud on the part of the purchaser, has the complete *jus disponendi* of the whole partnership property. But in regard to the power of one partner to make an assignment of the partnership effects for the benefit of creditors,

there is some conflict in the authorities, and the law, in some respects, is not conclusively settled.

The principles deducible, as settled by the weight of authority, appear to be these :

1. That one partner may assign a portion or the whole of the partnership effects *directly* to creditors, in payment of partnership debts.

2. That an assignment made by one partner in the name of the firm, and with the consent of his copartners, is of the same effect as if made by all.

3. That one partner cannot make a general assignment *to trustees* for the benefit of creditors, against the consent or without the concurrence of his copartners, the latter being present and capable of acting in the matter.

The numerous authorities upon these points may be found referred to and collated in Burrill on Assignments, pp. 18, note (4), 86–89; 3 Kent's Com. (7th ed.), 44, and notes (*a*) and (1); Collyer on Part., §395 and notes.

I have not met with a case where it has been decided for or against the precise proposition—whether or no.at common law one partner can make a general assignment of the partnership property, to trustees, for the benefit of creditors, without giving preferences, when his copartner is absent and cannot be consulted. The cases bearing most directly upon the question have mostly grown out of controversies between partners themselves—for instance where one not joining in the assignment brings suit to set it aside—and the decisions have been based on the ground that such assignments work a dissolution of the partnership; are out of the course of trade ; not within the implied powers incident to the partnership relation; and are in fraud of the rights of the other partners. In some instances, too, the decisions have been influenced or controlled by local insolvent laws or statutes regulating these assignments.

After reviewing all the authorities, a general conclusion, which appears to me to be reasonable, has been announced as inferable from the decisions pertinent and analagous in principle, to this effect: that where a partner is absent, so that he cannot be consulted, an assignment by the copartner of the partnership property, in trust for creditors, without preferences, if made in good faith, for sufficient cause and

for the benefit of the firm, is valid and should be sustained. Burrill, 56–57 ; 1 Amer. L. Cases, 444.

To these principles of law let us apply the facts.

It is alleged that the firm of Nye Brothers & Co. consisted of Gideon Nye, Jr., Clement D. Nye, and Charles K. Tuckerman. By the proofs it is shown that Clement D. Nye, at the time of the failure, was residing and doing business at Shanghae, about nine hundred miles from Canton, and that it required from ten to fifteen days to make a trip and return between the two places. Tuckerman was a salaried partner, not sharing in the profits and losses, and at the time of the assignment was absent from China, on a trip to Calcutta. Subsequent to the assignment Clement D. Nye denied that he was a partner at the time of the failure, asserting at the same time that he had withdrawn from the house in August previous thereto. By the proceedings had before the United States Consul, as contained in the stipulation, it seems he held that the assignment received the assent and adoption of the copartners.

The immediate cause of the assignment was the arrival of the European mail, with the return of protested bills drawn by the firm upon London. It does not appear that either of the alleged partners have made objection or dissented to the assignment, but on the contrary, from the facts disclosed, the presumption is the assignment was fairly made and acquiesced in by them ; that it is beneficial to the interests of the copartnership, and the absent partner must be considered as having vested in Gideon Nye, Jr., implied authority to act in all matters for the benefit of the firm.

II. *Another objection is, the assignment is defective in form.*

In assignments of this character the law requires no particular form to be observed. They may be by the debtor to the assignees in the form of a *deed-poll*, without making the latter a party ; or *bipartite*, between the debtor and assignee, the latter executing it as a formal party ; or *tripartite*, between the assignor, assignee, and creditors, all executing it as formal parties.

It is sufficient if the creditor unconditionally and unreservedly transfers the whole of his property to one or more assignees for the benefit of all his creditors. By such an assignment a trust is created both at law and in equity, for all the creditors, rateably, and a court would en-

force and sustain it for their benefit. This assignment is substantially in conformity with the requirements of law. It is an absolute transfer of the whole property, without reservation, to the assignees in trust for the benefit of each and all the creditors. The assignees received the assignment upon this express condition, and having accepted it, and entered upon the performance of their duties, by intendment and operation of law there is an implied trust which they are as much bound faithfully to execute as if they had expressly covenanted to do so. They might have declined to act, but not doing so, by merely accepting the assignment without executing it, they become the trustees of the creditors, and a court, upon application, would compel the faithful execution of the trust for their benefit. This rule of law is not altered although the assignees are named as Messrs. Russel & Co., and James Purdon & Co., but is applicable to all or any of the parties named who have accepted. Neither is it necessary to the validity of the instrument that it should contain an express power to sell ; this is necessarily implied by every conveyance for the payment of debts. Burrill, 228–229, 263, 281, 451 ; 2 Story's Eq. J., §1045, and authorities cited.

Neither is the omission to annex the usual schedules sufficient to avoid the assignment. If it contains a provision, as is the fact here, that schedules are to be made out, (which by the proof appears to have been done in this case,) any inference of fraud from this circumstance is repelled. Such a provision is not a condition precedent to the operation of the assignment. Burrill, 255.

Nor do I think it a material or valid objection that the assignment is made for the benefit of the creditors of the assignor, and those of Nye Brothers & Co. The instrument itself creates no priorities, gives no preferences ; nor are the different classes of creditors by express terms placed upon an equality, or entitled to *pro rata* payments ; the assignment does not specify how or to whom the payments shall be made, but simply declares it is for the benefit of " *each and all.*" The payment of the private and firm creditors must therefore be made according to the ordinary rules of law applicable thereto, as established by the law of partnerships ; or as a court of competent jurisdiction may direct.

In this connection it may be remarked, by the stipulation it appears the validity of this assignment has been sustained by a judicial decision

of the U. S. Consul, at Canton, which, if not conclusive, should at least be received as some evidence of the *lex loci* of the assignment.

III. A further objection is, *the assignment has not been assented to or executed by all the assignees or by the creditors.*

In addition to what has been said it may be stated it appears that the assignees are proper and suitable persons for the position; that some of them have accepted, and it is not in proof that any have declined to act. Acceptance is presumed until the contrary is shown, even where the trustee is absent; and an acceptance by one or more of several assignees, where two or more are appointed, is operative as to the assenting trustee, unless the instrument of assignment contain a condition to the contrary. Burrill, 281–282 ; 2 Rt., 533 and note (*b*).

In this country it is authoritatively settled by the Supreme Court of the United States, as well as by most of the State Courts, that assignments *directly to creditors* are not valid without their consent, but if made *to trustees* for their benefit, it does not require their assent, or that they shall be formal parties, to render them valid and operative, unless the assignment is drawn with reference to the creditors becoming parties, or is made upon the express condition that they or a portion of them shall sanction it. If they are made in good faith by the debtor, and assented to by the assignee, the assent of the creditors will be presumed, and it will be deemed a valid conveyance, founded upon a valuable consideration, and good against creditors proceeding adversely by attachment, or seizure upon execution, of the property conveyed thereby, unless all the creditors for whose benefit the assignment is made repudiate it. 2 Story's Eq. J., §1036, a, and note (3) ; 2 Kt., 533, and notes (*a*) and (*b*) ; Burrill, 84, 307–316, and cases referred to.

In England the same rule has not been so uniformly adopted, and in some of the cases it has been held that the *assent* or *privity* of creditors to an assignment is essential to render it operative in their behalf. By reason of their bankrupt and insolvent laws these kinds of voluntary assignments have been discouraged by the Courts of that country, and how far the adverse decisions may have been influenced by their local laws and the use of the tripartite instrument of assignment, which it seems is there most commonly used, I have not sufficiently examined; but I feel unwilling to depart from the course of American adjudications, and adopt a rule which I consider less sound in principle.

The creditors in China, according to the proof, representing about two-thirds of the whole indebtedness of the firm, held several meetings with the assignees ; took measures to carry out the assignment ; assisted and gave instructions to the assignees about the property. This would be sufficient *assent* and *privity* on the part of the creditors resident in China, within the American or English rule, especially as a verbal assent is sufficient. Burrill, 317.

IV. The last objection that I shall notice is : *That the assignment is fraudulent and void.*

Excepting the absence of schedules, which has heretofore been referred to, there are none of the usual *indicia* of fraud appearing upon the face of the assignment itself. It is general in its terms and contains no unusual provisions or clauses, or any reservations in behalf of the assignors. Those of an extrinsic character referred to in the argument, and relied upon as sufficient to invalidate the assignment are as follows :

1. That the assignees have mismanaged the property, allowed the assignor to retain the possession of a portion, and to assist them in the performance of their duties as to the residue.

It is in evidence that at a meeting of the creditors at Canton, it was decided that the assignees should allow the wife of Gideon Nye, Jr., $2,000 worth of furniture belonging to his estate ; and also that the assignees employed Nye himself to assist them in the estate, at the rate of one hundred dollars per month.

In determining whether or no an assignment is fraudulent as against creditors, the question is not whether fraud *may be committed* by the parties to it, but whether the instrument itself is fraudulent in its operation. Subsequent events do not generally affect the character of the assignment. If it is valid in its creation, it is not invalidated by subsequent fraudulent or illegal acts of the parties. If the assignees, without sufficient authority, suffer the property to become lost to the estate, or diminished in value, they are not discharged from liability. If the estate sustains a loss on account of their shipping a portion of the goods to this market for sale, (not a reasonable probability,) they may render themselves personally liable for the deficiency ; but their acts alone, if illegal or fraudulent, cannot vitiate the assignment. Even if Gideon Nye, Jr., had withheld the furniture without any consent of

the assignees or creditors, the validity of the assignment would not have been impaired. Burrill, 304, 400–401.

Nor can the fact that the assignees employed the assignor as their agent or clerk, and as such he was in the possession of the property, be regarded as evidence of an original fraudulent intent. This, from want of necessary information, many times becomes essential to a proper execution of the trust; and the assignee is held responsible for his acts the same as any other agent or employee engaged about the business. Burrill, 303, 429–430.

2. That the assignment being void in part, because it conveys real and personal property, and is not under seal, is therefore void as a whole.

There are many exceptions to the rule that an assignment cannot be void in part without being void *in toto ;* and one of these is that it may be valid as to the personal property and void as to the real. Rodgers *vs.* Forrest, 7 Paige's Ch. R., 272 ; Burrill, 401–406.

This in controversy is personal property, and the instrument of assignment, as a simple contract, is sufficiently well executed to transfer the title to that kind of property.

There is no evidence that the assignors owned or possessed any real estate, and it is unnecessary to consider the validity of the assignment to convey that kind of property.

I have not noted all the cases from which my conclusions have chiefly been derived, but by consulting the text books as I have indicated, reference can be had to those not cited.

The validity of the assignment, and plaintiffs' title to the property at the time of the seizure, is sustained.

Judgment should be awarded in their favor for the value of the property, and a finding may be drawn accordingly.